AVRUM H. DANNEN, Trustee, Plaintiff-Appellant, *v.* JACQUELINE SCAFIDI, Defendant-Appellee.

First District (5th Division)   No. 78-1237

Opinion filed August 10, 1979.

Hoffman & Davis, of Chicago (Sol A. Hoffman, John L. Leonard, and Robert G. Higgins, of counsel), for appellant.

Martin, Drucker, Karcazes & Duax, Ltd., of Chicago (Donald Martin, of counsel), for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Avrum H. Dannen (plaintiff), as the trustee in bankruptcy of the estate of Diamond Drywall Service, Inc. (Drywall), brought suit against Jacqueline Scafidi (defendant) for an accounting and declaration of a trust. At the close of the plaintiff's case, the trial court granted judgment in favor of defendant. On appeal, plaintiff presents the following issues for review: (1) whether the trial court erred (a) by accepting the defense of shareholder ratification where the acts allegedly ratified constituted a criminal and illegal scheme to avoid taxes, and (b) by requiring the trustee in bankruptcy to show that defendant harmed or intended to harm Drywall's creditors; and (2) whether the limitations period employed by the trial court was inapplicable to the instant case.

In count I of his complaint, plaintiff alleged that after Drywall filed a voluntary petition for bankruptcy, he was duly appointed trustee in bankruptcy of its estate; that defendant is the surviving spouse and sole surviving joint tenant of Thomas N. Scafidi (decedent), who died on or about April 18, 1971; that the instant action is brought pursuant to the authority granted him as trustee under sections 11 and 23 of the Bankruptcy Code (11 U.S.C. §§29, 46 (1976); that prior to his death, decedent as sole shareholder, member of the board of directors, and chief executive officer managed Drywall and was in exclusive control of its entire operation; that upon information and belief, defendant was also an officer of Drywall prior to the death of decedent; that thereafter, she succeeded to the ownership of all outstanding stock in Drywall, became its chief executive officer and exercised exclusive control of its operations; that subsequently, on November 17, 1972, she sold her entire interest in Drywall to Eric Wilson, a tradesman and employee of Drywall for several years prior thereto; that Wilson was skilled in the dry-wall phase of the building and construction industry; but, with the exception of some office experience occurring immediately prior to such sale, he had no previous training or experience in business or finance; that despite his sustained efforts, Drywall's financial condition continued to deteriorate due to the lack of working capital, precipitating the voluntary bankruptcy petition;

that while under the direction of decedent, Drywall purchased a substantial quantity of its building materials and supplies from the Wille Building Materials Corporation (Wille) which, as a business practice, paid its customers a cash or trade discount of 2% of gross billing; that from September 24, 1968, through April 2, 1971, Drywall purchased building materials from Wille for which it paid the gross invoice price and, per instructions of decedent, the discounts earned by Drywall were paid to him personally; that such discounts amounted to $102,802.22; that the discount checks were endorsed by decedent and most were also endorsed by defendant; that all or part of the proceeds of such checks were used by the Scafidis to purchase, finance and maintain real and personal property, including certain described parcels and other property as yet unknown to him; that defendant, upon the death of her husband, became the sole owner of such property; that she holds funds in the amount of $102,802.22 and income derived therefrom as a constructive trust for the benefit of Drywall's estate on grounds (a) that she acted in concert with decedent knowingly, wilfully and fraudulently in diverting such funds to their personal use and commingled them with their other property, and (b) that she, as an officer of Drywall, participated in such diversions from September 24, 1968, through April 2, 1971, and thereby breached her fiduciary duty to the corporation and such breach is a continuing one as, upon attaining the status of sole shareholder and chief executive officer, she continued to retain such funds; and that he has no adequate remedy at law. The relief sought on the basis of the allegations of count I was an accounting, a declaration of a trust, and entry of judgment for $102,802.22 together with all property—real and personal, benefits, emoluments, profits and income derived therefrom. Attorneys' fees and costs were also sought.

Count II reasserted the allegations in count I relating to the diversion of Drywall funds and further alleged that the Scafidis had never repaid such funds. On this basis, Dannen sought judgment in his favor of $102,802.22 plus interest and costs.

In her answer, defendant generally denied the allegations of the complaint but admitted that prior to his death, decedent was the sole shareholder and chief executive officer of Drywall; that she endorsed many of the Wille checks but had no information that such funds were not returned in whole or in part to Drywall; that she was an officer of Drywall from September 24, 1968, through April 2, 1971; that upon her husband's death, she became the sole owner of Drywall; and that she sold all of her stock to Wilson on November 17, 1972. Moreover, she alleged on information and belief that Wilson employed an independent accountant to review Drywall's books prior to acquiring the corporation.

She then asserted a number of affirmative defenses, pertinent of

which are (1) that having paid two Drywall notes in the amount of $53,584.44 and having loaned Drywall $68,000, she was entitled to a setoff; (2) that the limitations period for actions based upon fraud and conversion was five years (Ill. Rev. Stat. 1977, ch. 83, par. 16) and that most of the Wille checks predated such period; and (3) that the personal use, if any, by the decedent of corporate funds did not operate as a breach of fiduciary duty to the stockholders or creditors of Drywall.

Prior to trial, defendant admitted the genuineness of the endorsements of her husband and herself which appeared on the Wille checks drawn to the order of decedent. Such checks amounted to $8,745.90 in 1968, $58,804.88 in 1969; $28,631.38 in 1970; and $46,582.06 in 1971.

From the testimony adduced, it appears that these checks represented trade discounts earned by ordering material in large volume and cash discounts earned by payment for material within 30 to 45 days of its delivery. As Drywall was responsible for a million dollars of Wille's business per year and often generated in excess of $100,000 business monthly, Wille was willing to honor decedent's request that the discount checks owing to Drywall be drawn to his personal order. While decedent was alive, Drywall's account with Wille was current and, after Wilson took control of Drywall, the discounts were subtracted from the gross invoice amount so that Drywall paid only the net amount of each invoice. About one year after decedent's death, Wille demanded and received a note signed by defendant, Wilson and other corporate officers for $118,000 to guarantee the account receivables of Drywall.

Defendant, called as a section 60 witness, testified that she had been titular vice president of Drywall since June 1, 1968, and had endorsed the Wille checks per her husband's instructions. Such checks were customarily deposited in their joint checking account and her husband would later transfer the funds to the joint savings account, from which he paid Drywall's operating expenses. Sometimes, however, he ordered her to cash such checks and to tender the funds to him for the use of Drywall. Although she was free to spend the checking account funds for personal expenses, she was not allowed to make withdrawals from their savings account absent his express direction to do so. Moreover, decedent had constant custody of the savings passbook and usually kept it in his desk at the Drywall offices. She and her husband arranged a $25,000 personal loan, using a Drywall account as collateral. In addition, a $25,000 investment in a partnership (which interest was jointly owned by the Scafidis) and a $5,000 capital contribution to another corporation (which was partially owned by the decedent) were obtained from the funds in their joint savings account. After her husband's death on April 18, 1971, she became the sole shareholder.

From the testimony of Eric Wilson, it appears that he was first employed by Drywall as an installer in November 1969, and a year later became a superintendent responsible for scheduling manpower and for overseeing job progress in the field. During the time defendant was president, Wilson was promoted to vice president but his office duties were few and he worked primarily in the field. Prior to purchasing all of the stock of Drywall on November 17, 1972, Wilson's managerial experience was limited to running a gas station in Arkansas which went bankrupt in the 1950's. When he made the purchase, Wilson promised to assume payment of two of Drywall's notes which defendant had guaranteed. His personal funds were low, and he expected to meet his obligations with revenues generated by Drywall, which had a very good reputation in the industry with considerable work in progress. Nevertheless, two months later, in December 1972, Wilson arranged for an audit, which disclosed that the company was in a poor financial condition because of a shortage of operating capital, although the assets and liabilities were about even. Such knowledge, however, did not motivate him to accept defendant's offer in January 1973 to repurchase the corporation's stock.

Thereafter, a bank after being apprised of Drywall's financial posture granted it a $100,000 loan on the basis of its accounts receivable, and this loan not only enabled the company to acquire several lucrative new contracts but also permitted Wilson to move Drywall to larger quarters, which were also closer to his home. Later, although Wilson considered but did not carry out his accountant's suggestion to start a competing business and transfer all Drywall's assets to such concern, he also testified that Drywall was forced into bankruptcy by the bank's demand for repayment within 30 days of the $100,000 loan. No reason for calling in the loan appears of record.

At the close of plaintiff's case, the court granted defendant the judgment which is the basis of this appeal.

OPINION

Plaintiff first contends that the trial court erred (a) by accepting the defense of shareholder ratification where the acts allegedly ratified constituted a criminal and illegal scheme to avoid taxes, and (b) by requiring the trustee in bankruptcy to show that defendant harmed or intended to harm Drywall's creditors.

■■■ The trustee in bankruptcy is vested with all rights of action belonging to the bankrupt at the time the petition in bankruptcy was filed. (11 U.S.C. §110(a)(5) (1976); *Howard v. Insull* (1938), 294 Ill. App. 20, 13 N.E.2d 506.) A fiduciary relationship exists between the directors of a corporation and its stockholders and, in many instances, its creditors.

(*Winger v. Chicago City Bank & Trust Co.* (1946), 394 Ill. 94, 67 N.E.2d 265.) The *Winger* court stated that ordinarily:

"[P]roperty obtained by directors acting in their capacity as trustees may be recovered, together with all of its increase and earnings, and the beneficiary may elect, if it so desires, to take it in its altered form. [Citation.] * * * [T]here is a duty resting upon trustees not to commingle their own property with that of the beneficiaries, [citation] and where they do so commingle, in cases where the fiduciary relation exists and they have obtained the property by reason and because of the fiduciary relationship, the burden then rests upon the trustees to show by strong and convincing evidence, the property, or the part thereof that belonged to them before the commingling took place." (394 Ill. 94, 111, 67 N.E.2d 265, 277.)

However, stockholders may by their unanimous consent, either by direct act or acquiescence, invest corporate officers with the power to appropriate corporate property to noncorporate purposes where the rights of creditors and violations of law are not involved, so that all acts done within such power are acts of the corporation. (*Lake Park Development Co. v. Paul Steenberg Const. Co.* (1937), 201 Minn. 396, 276 N.W. 651; *Goddard's Ltd. v. Bank of Nova Scotia* (D. Virgin Is. 1966), 255 F. Supp. 58.) Acts which cannot be so ratified are illegal acts, such as falsification of corporate income tax returns (*Sellers v. Head* (1954), 261 Ala. 212, 73 So.2d 747) and the forgery of corporate checks (*McConnico v. Third National Bank* (Tenn. 1973), 499 S.W.2d 874). In each of these cases, it was the illegal method by which corporate funds were appropriated, rather than their appropriation itself, which precluded shareholder ratification. Moreover, the appropriation of corporate funds which is not accomplished by illegal means may be ratified by the unanimous action of the shareholders so long as the rights of corporate creditors are not impaired. (*Field v. Lew* (E.D.N.Y. 1960), 184 F. Supp. 23, *aff'd sub nom. Field v. Bankers Trust Co.* (2d Cir. 1961), 296 F.2d 109, *cert. denied* (1962), 369 U.S. 859, 8 L. Ed. 2d 17, 82 S. Ct. 948; 3A W. Fletcher, Cyclopedia of the Law of Private Corporations §1104 (1975).) To show the impairment of creditor rights by such appropriation, intent to harm, or harm resulting to corporate creditor must be demonstrated. *Neese v. Brown* (1964), 218 Tenn. 686, 405 S.W.2d 577; *Gill v. Ash* (1915), 124 Md. 612, 93 A. 210. See also Ill. Rev. Stat. 1977, ch. 30, par. 202; Ill. Rev. Stat. 1977, ch. 59, par. 4; *McKey v. Cochran* (1914), 262 Ill. 376, 104 N.E. 693; *Kennard v. Curran* (1909), 239 Ill. 122, 87 N.E. 913; *Highley v. American Exchange National Bank* (1900), 185 Ill. 565, 57 N.E. 436.

Here, defendant testified that decedent used the proceeds of the Wille checks at least in part to pay the operating expenses of Drywall.

This fact does not, however, excuse the commingling of corporate funds with the personal funds of the Scafidis. While a clear demonstration was not made as to the funds in their joint account prior to the commingling, it cannot be disputed that decedent appropriated some corporate funds and that defendant, also an officer of Drywall and decedent's surviving joint tenant, received and has retained benefits from such appropriation. This conclusion leads to the question whether the appropriation was authorized and, in this regard, as it occurred while decedent was the sole shareholder of Drywall, the unanimity of shareholder approval is obvious. (*Field v. Lew.*) Nevertheless, to avoid the application of the shareholder ratification rule, plaintiff argues that decedent appropriated the funds illegally by involving Drywall in a tax avoidance scheme, *i.e.*, the corporation presumptively deducted the payments of the gross rather than the net amount of the Wille invoices from its tax returns. It does not appear, however, that this argument is supported by the record. While the joint returns of the Scafidis which were received in evidence indicate that the appropriated funds were not reported by them, the corporate returns are not in the record, and plaintiff has referred us to no evidence indicating that in its returns Drywall deducted the gross amount of the Wille invoices. In the absence of such evidence, we cannot accept plaintiff's contention that decedent appropriated funds illegally by involving Drywall in a tax avoidance scheme. Moreover, there is also nothing to negate the fact that the excess deductions may have been justified by the payment, albeit a circuitous method, of reasonable compensation to its chief executive officer. *L. R. Schmaus Co. v. Commissioner of Internal Revenue* (7th Cir. 1969), 406 F.2d 1044.

Furthermore, we believe that plaintiff's further contention that the appropriation of corporate funds authorized by unanimous consent of the shareholders was rendered illegal by the decedent's intent to falsify his personal returns is likewise without merit. This follows because we believe it is the illegal act which precludes shareholder ratification and not a legal act accompanied by an underlying wrongful purpose. (*Field v. Lew; Sellers v. Head; McConnico v. Third National Bank.*) In addition, plaintiff's contention that intent to harm or harm resulting to the creditors of the corporation need not be shown must fall of its own weight, because any legal act receiving the unanimous consent of the shareholders, as we view to be the case here, cannot be termed as wrongful where there is no harm to present or subsequent creditors. In light thereof, we do not believe the trial court erred either by application of the defense of shareholder ratification or by requiring proof of harm or intent to harm creditors as a prerequisite of the trustee in bankruptcy's avoidance of the application of such defense.

Because of these conclusions, plaintiff's remaining contention, that

the trial court improperly found this action barred by the statute of limitations, need not be considered.

For the reasons stated, the judgment appealed from is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.