**In re Brenda Kay BROWN, Debtor.**

**No. 12–70013.**

United States Bankruptcy Court,
E.D. Kentucky,
Pikeville Division.

Aug. 24, 2012.

---

Brenda Kay Brown, Pro Se, Paintsville, KY.

John M. Simms, Lexington, KY, for Trustee James R. Westenhoefer.

John L. Daugherty, Rachelle C. Dodson, Lexington, KY, U.S. Trustee.

**ORDER GRANTING IN PART MOTION TO APPROVE SETTLEMENT AGREEMENT UNDER RULE 9019 AND AUTHORIZING TRANSFER OF ASSETS UNDER 11 U.S.C. § 363**

JOSEPH M. SCOTT, JR., Bankruptcy Judge.

This matter comes before the Court on the Joint Motion to Settle and Compro-

mise and Authorizing Transfer of Assets under 11 U.S.C. § 363 (the "Settlement Motion") (Bk. Doc. 225; AP Doc. 32)[1] seeking approval of a settlement agreement ("Settlement Agreement") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and a transfer of assets pursuant to 11 U.S.C. § 363, by and among (i) James A. Brown ("Mr. Brown"), by and through Richard Wehrle, conservator ("Conservator") and Paul Brown, guardian ("Guardian," collectively with Mr. Brown and the Conservator, the "Conservator Parties"); (ii) Martin's Rest Home Inc., d/b/a Grand Haven Nursing Home ("Nursing Home"); (iii) CBS Corporation d/b/a Lee's Famous Recipe ("Lee's"); (iv) Brown Ambulance Service, Inc. ("Ambulance"); (v) Brown & Gasser Thrift Food Market, Inc. ("Food"); (vi) James A Brown Enterprises LLC d/b/a Ramada Paintsville ("Ramada"); (vii) Redd–Brown and Williams Construction Co., Inc. ("RBW"); (viii) M. Goldberg Incorporated ("Goldberg", which collectively with the Conservator Parties, Nursing Home, Lee's, Ambulance, Ramada, and RBW and Goldberg, are hereinafter referred to as the "Brown Parties"), and the bankruptcy estate ("Estate") of Brenda Kay Brown ("Debtor"), by and through the Estate's trustee, James R. Westenhoefer ("Trustee") (hereinafter, the Brown Parties, Estate and Trustee, are referred to as the "Movants"). The Debtor filed an Objection to the proposed settlement (AP Doc. 37) and a memorandum in support of the Objection (AP Doc. 48) (collectively, "Objection"). Hearings were held on July 19, 24 and 27, 2012 (collectively "Hearings"), on the Settlement Motion.

Venue for Debtor's Chapter 7 case and the adversary proceeding is proper in this District under 28 U.S.C. §§ 1408 and 1409. This Court has jurisdiction of this Chapter 7 case and this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This matter arising under Federal Rule of Bankruptcy Procedure 9019(a) constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A). The following constitutes the Court's findings of facts and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### FACTS

1. The Debtor and Mr. Brown were married on February 2, 2008.

2. On the day of their marriage, Mr. Brown and the Debtor entered into an agreement ("Antenuptial Agreement"). Under the Antenuptial Agreement, the Debtor and Mr. Brown agreed that all property, both real and personal, owned by each party as of the date of the marriage would remain the owner's separate property, both during and after the marriage.

3. Attached to the Antenuptial Agreement are financial statements reflecting that the Debtor had a net worth of $236,000 and Mr. Brown had a net worth in excess of $114,000,000.

4. John M. Keith, Jr., signed the Antenuptial Agreement as counsel for Kay Brown, stating, "I have reviewed the foregoing Antenuptial Agreement and explained the same to Kay."

5. F. Gerald Greenwell prepared the Antenuptial Agreement and signed it as counsel for Mr. Brown.

6. Prior to his marriage to Debtor, Mr. Brown prepared a will and estate plan ("Initial Will"), which left all of his property to a charitable trust.

---

1. References to the docket in the related adversary proceeding, No. 12–7004 ("Adversary Proceeding") appear as (AP Doc. ——). References to the docket in the Debtor's main bankruptcy case appear as (Bk. Doc. ——).

7. Under the terms of the Antenuptial Agreement and the Initial Will, the Debtor will not receive anything from Mr. Brown's estate upon dissolution of their marriage or at his death.

8. On December 23, 2008, approximately ten months after their marriage, Mr. Brown suffered a disabling stroke that left him incapable of caring for himself or handling his financial affairs.

9. Approximately four months after his stroke, the Debtor caused Mr. Brown to execute, a Durable Power of Attorney appointing the Debtor as Mr. Brown's attorney-in-fact, with the power to handle his financial affairs (the "Power of Attorney").

10. The Power of Attorney expressly provided that the Debtor could not give away any of Mr. Brown's property.

11. The Conservator Parties allege that after Mr. Brown's stroke, the Debtor engaged in a pattern of fraudulent activities to transfer substantially all of Mr. Brown's assets to Debtor.

12. On March 3, 2010, Wehrle filed with the Commonwealth of Kentucky, Harrison District Court (the "District Court") (i) a petition seeking a jury determination of Mr. Brown's competency, and if he was determined by the jury to be disabled, the appointment of a guardian to protect Mr. Brown's health and assets (the "Conservator Action") and (ii) an emergency petition for the appointment of a fiduciary to prevent the Debtor from selling the Nursing Home until Mr. Brown's competency could be determined and a guardian appointed in the Conservator Action.

13. Following a hearing on the appointment of a conservator and permanent guardian, on October 11, 2011, by order of the District Court ("Conservator Order"), Wehrle was appointed Conservator for Mr. Brown and Mr. Brown's brother, Paul Brown, was appointed as his health care Guardian.

14. In the Conservator Order, the District Court instructed the Conservator to "vigorously pursue the recoupment of [Mr. Brown's] assets." Conservator Order at 8.

15. In summary, the District Court found that based upon the limited and, "questionable Power of Attorney," the Debtor:

a. Paid off her daughter's home mortgage of $123,000 plus. Debtor's daughter is not Mr. Brown's daughter;

b. Changed all of Mr. Brown's Certificates of Deposit ("CDs") from his sole name to "James A. Brown or Kay Brown" thereby "giving away" one-half of Mr. Brown's approximate $5,000,000 in CD's to herself, and making herself surviving owner by operation of law of the entire Certificate balance;

c. Gave her daughter checks totaling $30,500;

d. Purchased a residence in her sole name at 250 Robin Hill Road, Paintsville, Kentucky, for the sum of $800,000 in July, 2009, for which no mortgage appears of record ("Paintsville House");

e. Had prepared and "executed" by Mr. Brown a deed to Mr. Brown's bank property ("Bank Property") in Paris, Kentucky ("Bank Deed"), which property had a stated value of $840,500, but the Bank Deed was described as a gift to the Debtor.

f. Had prepared and "executed" by Mr. Brown on October 30, 2009 and November 3, 2009, twenty-two additional deeds (together with the Bank Deed, the "Brown Deeds") representing all of Mr. Brown's real estate holdings in Harrison County, Nicholas County and the Ramada Inn in Johnson County (together with the Bank Property, the "Brown Real Properties"), with Kay Brown as the grantee. The District Court states that

the total value of the Brown Real Properties represented by the deeds is believed to be in excess of $6,200,000 and the Brown Real Properties were transferred to Debtor for "love and affection." The District Court's description of the testimony regarding the execution of the Brown Deeds calls into question the validity of those deeds.

g. Purchased for $64,000 cash, in her sole name, a Mercedes automobile on April 19, 2011, without the knowledge of a temporary limited guardian appointed for Mr. Brown and in direct violation of the District Court's "status quo" order ("Status Quo Order").

h. On September 21, 2009, Debtor changed the beneficiaries on Mr. Brown's life insurance policy with State Farm, making herself primary beneficiary and her daughter, alternate beneficiary. On December 7, 2010, Debtor redeemed the dividends in a check payable to herself in the amount of $96,000, again without the knowledge or consent of the temporary limited guardian and in violation of the Status Quo Order.

i. On or about June 23, 2011, Debtor redeemed a certificate of deposit in the amount of $524,966.37, then held in the name of James A. Brown or Kay Brown, and deposited the proceeds in an unidentified account at City National Bank, again without the knowledge or consent of the temporary limited guardian and in violation of the Status Quo Order.

j. On or about June 1, 2009, Debtor had her attorney prepare a new will ("New Will") for Mr. Brown, leaving everything to Debtor or alternately to her children. The District Court's description of the testimony regarding the execution of the New Will calls into question the validity of that will.

Conservator Order at 3–5.

16. The Court understands that shortly after his appointment, in compliance with the Conservator Order, the Conservator returned ownership of Mr. Brown's remaining CDs to Mr. Brown as sole owner.

17. To recover Mr. Brown's remaining assets referred to in the Conservator Order, the Conservator filed the following three lawsuits in November 2011, in the Harrison County, Kentucky Circuit Court (the "Circuit Court"): *Brown v. Brown, et al.*, Case No. 11–CI–00343 (filed 11/15/2011) ("Will Suit"); *Brown v. Brown,* Case No. 11–CI–00340 (filed 11/14/2011) ("Title Suit"); and *James A. Brown Construction Co., et al. v. Brown, et al.,* Case No. 11–CI–00344 (filed 11/15/2011) ("Recovery Suit"). The Conservator and Guardian also filed a divorce action *Brown v. Brown,* Case No. 11–CI–00404 (filed 12/29/2011) ("Divorce Suit") in the Harrison Circuit Court. The Divorce Suit, Recovery Suit, Will Suit and Title Suit are referred to collectively as the "Lawsuits."

18. There is also a petition for legal separation pending in the Johnson Family Court ("Family Court") styled *Brown v. Brown,* Case No. 11–CI–00509 ("Debtor's Separation Suit"). This suit was filed by the Debtor against Mr. Brown, the Conservator, and the Guardian.

19. On January 13, 2012 (the "Petition Date"), the Debtor filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of Kentucky, Pikeville Division under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended (the "Bankruptcy Code"). Upon the filing of this case, all of the Debtor's assets, including, but not limited to, all of her claims against the Conservator Parties or their assets, became property of the Estate.

20. On January 24, 2012, the Debtor filed Adversary Proceeding No. 12–07004,

("Adversary Proceeding") against the Conservator Parties requesting, in part, the following relief:

a. Declaratory relief finding that the Antenuptial Agreement is invalid and unenforceable under Kentucky law;

b. Declaratory relief finding that the New Will is valid and enforceable under Kentucky law;

c. Declaratory relief finding that the Brown Deeds are valid and that the Brown Real Properties, and the rents generated therefrom, are property of the Estate;

d. Declaratory relief finding that one-half of the value of the CDs transferred from Mr. Brown individually to Mr. Brown and Debtor, jointly, is property of the Estate;

e. A finding that the Conservator Parties willfully violated the automatic stay; and

f. Requiring the Conservator Parties to turn over the CDs, Brown Real Properties and rents to the Debtor.

21. On January 27, 2012, the Debtor filed her initial schedules and statement of financial affairs ("SOFA") (Bk. Doc. 32). In the initial schedules and SOFA, the Debtor listed as assets her interests in all of Mr. Brown's assets and "all other interests in the estate of James A. Brown."

22. On February 9, 2012, the Conservator Parties filed a Motion to Dismiss this case, which they later amended to a Motion to Convert the case to a Chapter 7 proceeding (Bk. Doc. 48).

23. On March 8, 2012, the Debtor filed an amended set of schedules and SOFA ("First Amended Schedules") (Bk. Doc. 86). In the First Amended Schedules, the Debtor maintained her listing of Mr. Brown's assets. The First Amended Schedules also disclosed a previously omitted asset of $377,760.39 of "liquid assets being held by a brother."

24. On March 22, 2012, Debtor's Chapter 11 was converted to a Chapter 7 proceeding with the agreement of the Debtor (Bk. Doc. 132).

25. On March 23, 2012, the Trustee was appointed as the Chapter 7 Trustee for the Estate.

26. On April 24, 2012, the Debtor filed a second amended set of schedules (Bk. Doc. 178) ("Second Amended Schedules"). The property claims made in the Debtor's sworn schedules to Mr. Brown's assets were not changed.

27. On June 22, 2012, the Conservator, on behalf of Mr. Brown, filed Proof of Claim No. 17 in this case in the amount of $12,954,640.62 ("Mr. Brown's Claim") on the basis that Debtor converted Mr. Brown's assets to her own.

28. The following Brown Parties have also filed proofs of claim in this case as follows:

| | | |
|---|---|---|
| a. | Nursing Home | $124,868.83 (Claim No. 14) |
| b. | Lee's | $801.93 (Claim No. 18) |
| c. | Ambulance | $103,500.00 (Claim No. 13) |
| d. | Food | $6,684.53 (Claim No. 11) |
| e. | Mr. Brown | $12,954,640.62 (Claim No. 17) |
| f. | Ramada | $171,126.00 (Claim No. 15) |
| g. | RBW | $1,336,972.38 (Claim No. 16) |
| h. | Goldberg | $50,000.00 (Claim No. 12) |

(together with Mr. Brown's Claim, the "Brown Parties' Claims").

29. Shortly after the Trustee's appointment, he began to investigate the Debtor's

various claims against the Conservator Parties asserted in the Adversary Proceeding. The Trustee also reviewed the pleadings, documents and testimony of the bankruptcy case, as well as the numerous state court actions involving the Debtor.

30. On July 3, 2012, the Trustee filed a substitution of himself as the plaintiff/real party in interest (AP Doc. 30) in the Adversary Proceeding.

31. After completing his investigation, the Trustee began settlement discussions with the Brown Parties, which culminated in the filing of the Settlement Motion on July 6, 2012.

### SETTLEMENT AGREEMENT

The Brown Parties assert that virtually all of the assets listed in Debtor's schedules, except for real estate located at 1701 Euclid Avenue, Paintsville, Kentucky ("IGA Property"), were fraudulently transferred by Debtor from Mr. Brown to herself after Mr. Brown's stroke. The Brown Parties assert that these assets are still the sole property of Mr. Brown and that the Estate has no interest or rights in these assets. The Trustee asserts that the Estate has or may have an interest and rights in at least some of the assets (other than just the IGA Property) listed on the Debtor's schedules.

Under the Settlement Agreement, the Brown Parties waive any and all claims of ownership against the Estate to the following assets. The waiver will allow the Trustee to liquidate these assets without litigating ownership rights with the Brown Parties:

a. $61,039.52 in Debtor's personal checking account that is currently subject to a restraining order obtained by the Conservator Parties;

b. The unencumbered Paintsville House valued at $800,000.

c. The furnishings and household goods located in the Paintsville House.

d. All jewelry of the Debtor, including assets not listed by the Debtor in her schedules.

e. The 2010 Toyota Tacoma and 2011 Mercedes titled in Debtor's name. The Trustee has a motion (Bk. Doc. 227) pending to sell the Mercedes for $35,000.

f. All claims of the Estate, including, but not limited to, all avoidance actions under Chapter 5 of the Bankruptcy Code.

g. All funds held by the Debtor's brother for the Debtor, including, but not limited to, all funds received directly or indirectly from the Debtor since the Debtor's marriage to Mr. Brown.

h. A reduction in Mr. Brown's Claim from $12,954,640.62 to $2,914,449.62.

i. The Brown Parties agree to subordinate any right they have to a pro rata share of the first $100,000 the Trustee distributes to all other creditors.

j. After distribution of the initial $100,000, the Brown Parties will share pro rata in money obtained by Trustee in liquidating the Estate.

In exchange, the Brown Parties will receive from the Estate the assets listed below. To effectuate the transfer of certain assets, the Trustee will enter an appearance in the Title Suit and Recovery Suit and will file agreed orders consenting to the relief requested by the Brown Parties in those Lawsuits.

a. Allowance of Mr. Brown's Claim in the amount of $2,914,449.62 as an unsecured claim.

b. Allowance of the other Brown Parties' Claims, as unsecured, in the amounts set forth above.

c. The Trustee waives the attorney-client privilege of the Debtor and the Estate with respect to the Debtor's pri-

or attorneys as listed in the Settlement Agreement. Excluded from the waiver, is any attorney-client privilege of the Debtor with her criminal counsel or with her counsel from the time Debtor's case was converted to a Chapter 7 proceeding.

d. The Trustee will disclaim any interest in the Brown Real Properties and transfer such properties back to Mr. Brown, free and clear of all liens, claims and interests, including any dower interest that the Debtor has or may have.

e. Upon the Estate obtaining possession and ownership of the following property, the property shall be transferred to the Brown Parties, free and clear of all claims, interests and liens:

(i) A five carat diamond ring;

(ii) Any and all stock of the Farmer's National Bancorp of Cynthiana, Inc.

(iii) All property of Southern Accents currently stored at 132–134 Pike Street, and all property located in the house at 112 Grandview Drive, Cynthiana, Kentucky; and

(iv) Any and all automobiles titled in Mr. Brown's name and the pool table, Rolex watch and other personal property originally owned by Mr. Brown.

The Settlement Agreement provides that upon entry of an order approving the Settlement Agreement, the Estate will enter into an agreed order granting judgment to the Brown Parties that (i) the Antenuptial Agreement is valid and enforceable under Kentucky law, and (ii) the New Will is void *ab initio* and the Initial Will is the valid will of Mr. Brown.

Finally, the Settlement Agreement contains a severability clause providing that if any provision or portion of the Settlement Agreement is found by any court of competent jurisdiction to be invalid or null and void, that the remaining provisions shall continue in full force and effect to the extent permitted by law.

### PROBATE AND DOMESTIC RELATIONS EXCEPTIONS TO JURISDICTION

Initially, the Court considers whether it is the appropriate forum to approve the Settlement Agreement as it relates to the agreed stipulations that the New Will is invalid and that the Antenuptial Agreement is valid. Particularly, whether consideration of these two matters would violate the "probate" and "domestic relations" exceptions to federal jurisdiction as defined by the U.S. Supreme Court in *Marshall v. Marshall*, 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006). In *Marshall*, the Supreme Court narrowly construed the exceptions. *Marshall*, 547 U.S. at 307–08, 311–12, 126 S.Ct. at 1746, 1748 (domestic relations exception applies to issues that arise in granting of divorce, alimony and child custody decrees; probate exception applies to the probate or annulment of a will and the administration of a decedent's estate).

■ *The New Will.* In addition to considering the probate exception, the Court must also determine whether the issue of the validity of the New Will is ripe for decision. At this time, Mr. Brown is still alive.

In the Settlement Agreement, the Trustee resolves the Debtor's claim under Count II of the Complaint filed in the Adversary Proceeding which seeks a declaration pursuant to Kentucky law that the New Will is valid. In her prayer for relief under Count II, the Debtor specifically seeks an order from this Court:

a. Containing a declaration that the New Will is valid and enforceable pursuant to the laws of the Commonwealth of Kentucky;

b. Containing a declaration that the Debtor's interest in the property to which the Debtor is entitled in connection to the New Will is property of the estate by virtue of the Debtor's interest therein, pursuant to § 541(a); and

c. Granting the Debtor any such further relief as the Court deems appropriate under the circumstances.

The declaratory relief sought by the Debtor concerning the validity of the New Will and the Trustee's agreement as part of the settlement that the New Will is invalid falls squarely into the probate exception removing from the federal courts the ability to annul a will. The Movants argue that invalidating the New Will has nothing to do with probating the will and does not interfere with property in the custody of a probate court. They ignore the fact that the probate exception also applies to annulling a will. A finding that the New Will is "void *ab initio*" as contemplated in the Settlement Agreement means that the New Will is "null from the beginning." An "annulment" would have the same effect, the New Will never existed or is rendered void from the beginning. *See* Black's Law Dictionary (9th ed. 2009).

█ Mr. Brown is not dead. Therefore, even if it did have authority to determine the validity of the New Will, the Court would not do so because any finding as to the validity of the New Will at this time will not affect property of the Estate.

The Movants cite *In re Ring*, 138 Fed. Appx. 834 (7th Cir.2005) in support of their argument that this Court can approve settlement of the Debtor's potential inheritance under the New Will. The Court agrees with the general holding of the Seventh Circuit in *In re Ring* that all of a debtor's legal claims, including the right to litigate issues related to an inheritance claim, are property of the estate. The Court further agrees that a chapter 7 trustee can compromise such claims. *In re Ring* is distinguishable from the case before this Court on an important fact. In *In re Ring*, the debtor's father was deceased. The debtor filed suit claiming that she was an illegitimate daughter mistakenly omitted from her father's will and that she was entitled to an inheritance from her father. Clearly, the trustee's settlement of the debtor's pending appeal had a direct impact on what constituted property of the debtor's bankruptcy estate. Whether or not this Court makes a decision on the validity of the New Will, no property comes into or goes out of the Estate.

The Movants next argue that Kentucky law provides that a party with an interest under a will can secure a declaration of rights. K.R.S. § 418.045 states as follows:

Any person interested in a deed, will or other instrument of writing, or in a contract, written or oral; or whose rights are affected by statute, municipal ordinance, or other government regulation; or who is concerned with any title to property, office, status or relation; or who as fiduciary, or beneficiary is interested in any estate, provided always that an actual controversy exists with respect thereto, may apply for and secure a declaration of his right or duties, even though no consequential or other relief be asked. The enumeration herein contained does not exclude other instances wherein a declaratory judgment may be prayed and granted under KRS 418.040, whether such instance be of a similar or different character to those so enumerated.

█ Contrary to the Movants' assertion, merely because the Debtor has raised the validity of the New Will in her Complaint does not mean that "an actual controversy exists" for the purposes of a declaratory judgment action under K.R.S.

§ 418.045. In this Court's review of cases deciding the interest of a party under a will pursuant to K.R.S. § 418.045, none of the cases involved a situation in which the testator was still living. The Movants have not provided citation to such a case. "The court may not declare prospective or future rights, unless there is an existing state of facts upon which those rights may be fixed." *Veith v. City of Louisville*, 355 S.W.2d 295, 297 (Ky.1962). The Estate's assets, based on any right of the Debtor to inherit from Mr. Brown, cannot be fixed at this time.

The Court will not approve the Settlement Agreement insofar as it determines the invalidity of the New Will and all provisions related thereto are, in accordance with the terms of the Settlement Agreement, invalid or null and void. *See Official Comm. of Unsecured Creditors of Artra Grp., Inc. v. Artra Grp., Inc. (In re Artra Grp., Inc.)*, 308 B.R. 851 (Bankr. N.D.Ill.2003) (approving settlement agreement in part where court found it did not have jurisdiction over a portion of the terms of the agreement).

■ *The Antenuptial Agreement.* In Count I of the Debtor's Complaint, she requests a declaration of rights pursuant to Kentucky law that the Antenuptial Agreement is invalid. Specifically, in her prayer for relief, the Debtor seeks an order from this Court:

a. Containing a declaration that the Antenuptial Agreement is void, invalid and unenforceable pursuant to the laws of the Commonwealth of Kentucky;

b. Containing a declaration that the Debtor's interest in property to which the Debtor is entitled in connection with the Divorce Petition is property of the estate by virtue of the Debtor's interest therein, pursuant to § 541(a); and

c. Granting the Debtor any such further relief as the Court deems appropriate under the circumstances.

■ The Divorce Suit and Debtor's Separation Suit are currently pending in two different state courts. Unlike the issue of validity of the New Will, the issue of validity of the Antenuptial Agreement, is ripe for determination. The Trustee's agreement to enter into a stipulation as to the validity of the Antenuptial Agreement is not a divorce decree, an award of maintenance, or a child custody determination, and therefore, is not subject to the domestic relations exception. *Marshall*, 547 U.S. at 307–08, 126 S.Ct. at 1746. Rather, as the Debtor originally requested in Count I of the Complaint, determination of the validity of the Antenuptial Agreement directly affects the determination of what is included in the Estate's property, including all financial rights of the Debtor that existed prior to bankruptcy. This information is critical to the Trustee for purposes of settling the Adversary Proceeding in a manner that is fair and equitable and in the best interests of the Estate.[2]

2. Bankruptcy courts have exclusive jurisdiction of all property of the debtor as of the commencement of the case and of property of the estate. 28 U.S.C. § 1334(e)(1). Courts have also determined that in connection with exercising exclusive jurisdiction over property of the estate, the bankruptcy court also has exclusive jurisdiction to determine whether or not property is property of the estate. *Brown v. Dellinger (In re Brown)*, 734 F.2d 119, 124 (2d Cir.1984) (bankruptcy court has exclusive jurisdiction to resolve competing claims to property of the estate); *Mata v. Eclipse Aerospace, Inc. (In re AE Liquidation, Inc.)*, 435 B.R. 894, 904–05 (Bankr.D.Del.2010) (holding that the bankruptcy court had exclusive jurisdiction to determine whether or not disputed aircraft was property of the estate at the time of its sale); *Brown v. Fox Broad. Co. (In re Cox)*, 433 B.R. 911, 920 (Bankr.N.D.Ga. 2010) (generally recognized that a proceeding to determining property of the estate is a core proceeding under § 157(b)(2)(A) and (E), and whenever there is a dispute regarding wheth-

This Court's determination is in line with the decision of the U.S. District Court for the Southern District of West Virginia in the case of *Ghannam v. Standish (In re Protan)*, 2011 WL 4597343 (S.D.W.Va. 2011). There, on appeal from a final order of the Bankruptcy Court, the District Court found that the Bankruptcy Court did not exceed its jurisdiction in determining a prenuptial agreement was invalid under state law. The District Court held:

> Here, the domestic law issues that needed to be resolved were basic contract interpretation (prenuptial agreement), resolution of a statutory tort (fraudulent transfer), and an unpaid debt. None of these issues required the bankruptcy court to grant a divorce, alimony or child support. All of these issues fall regularly within the bread-and-butter work of a bankruptcy court and, thus lie outside the scope of the 'domestic relations exception' to federal jurisdiction.

*Id.* at *17.

Therefore, this Court's consideration of the Settlement Agreement under Bankruptcy Rule 9019, by which the Trustee compromises the validity of the Antenuptial Agreement, is clearly not prohibited by the very narrow domestic relations exception to federal jurisdiction under both *Marshall* and *Protan.*

### EVIDENCE FROM THE HEARINGS

In support of the Settlement Motion and Settlement Agreement, the Trustee and Brown Parties presented the testimony of the Trustee concerning his assessment of the value of the Estate's claims against the Brown Parties, the value of the Settlement Agreement to the Estate, and the details of the Trustee's investigation of the facts underlying the proposed Settlement Agreement.

The Trustee testified that in considering the Settlement Agreement he investigated the underlying facts of this bankruptcy case, including the pleadings and testimony while the case was in chapter 11, and the Adversary Proceeding. As part of the Adversary Proceeding, the Estate asserted that the Antenuptial Agreement was invalid and unenforceable and that the Debtor's claims related to the Antenuptial Agreement involved property of the Estate.[3]

Further, the Trustee testified as to his extensive investigation of the underlying facts of and the record in the Conservator Action, including the Conservator Order, and review of pleadings and testimony in that action. Based upon this investigation, the Trustee indicated that he concluded that the Adversary Proceeding has almost no merit or value to the Estate given the District Court's Conservator Order. The Trustee also testified that entry into the Settlement Agreement, and the approval thereof by the Court, is in the best interests of the Estate and unsecured creditors of the Debtor based upon the benefits discussed in more detail below to settle the Estate's claims against the Brown Parties.

The Court finds that the Trustee's evaluation of the benefits of the proposed Settlement Agreement and the weakness of

---

er property is property of the bankruptcy estate, exclusive jurisdiction is in the bankruptcy court); *Heolena Chem. Co. v. True (In re True)*, 285 B.R. 405, 412 (Bankr.W.D.Mo. 2002) (bankruptcy court has exclusive jurisdiction to decide whether certain property is property of the bankruptcy estate).

**3.** The Adversary Proceeding also asserted claims as to the validity of the New Will. However, as the Court has found that issues involving the validity of the New Will are not ripe for decision and/or are subject to the probate exception, the Court has not included discussion as to the evidence relating to the circumstances surrounding the execution of the New Will.

the Estate's "claims" against the Brown Parties is well reasoned and well supported by the overwhelming weight of the evidence. The Court notes the Trustee is a very experienced bankruptcy professional who has worked as a trustee for a large part of his career. He is also experienced in determining whether claims of a bankruptcy estate should be resolved to benefit that estate, the valuation of claims and assets of an estate and benefits obtained by estates under such agreements.

The Debtor's testimony in opposition to approval of the Settlement Agreement was not only unconvincing, it was not credible in any respect. When questioned about the Antenuptial Agreement, Debtor testified that it was presented to her a few minutes before she got married. Debtor stated that prior to signing the Antenuptial Agreement, she did not have an opportunity to review it with any attorney. On cross examination, the Debtor admitted that she knew there was going to be an Antenuptial Agreement and that she had her financial information prepared so that it could be attached to the Antenuptial Agreement. The financial information is dated January 21, 2008—twelve days prior to the date the Debtor signed the Antenuptial Agreement.

Brooks Stumbo, one of Debtor's attorneys representing her in the Debtor's Separation Suit in Family Court, testified as the Debtor's expert witness on the issue of the value of the Estate's claims against the Conservator Parties. On cross examination, Mr. Stumbo conceded that due to his lack of knowledge of the actual facts surrounding the execution of the Antenuptial Agreement and the Brown Deeds, his evaluation of the merits of the claims the Estate might have against the Conservator Parties is uncertain. Essentially, Mr. Stumbo's testimony failed to support the Debtor's Objection and was of little or no

value as evidence of the value of the Estate's claims.

Debtor's testimony was also contradicted by several witnesses, including Mr. Keith, who was presented on behalf of the Debtor.

The record contains two affidavits signed by Mr. Keith. One dated July 28, 2011 ("Initial Keith Affidavit"), in which Mr. Keith stated with respect to the Antenuptial Agreement that: "Shortly prior to the wedding, the agreement was given to me to present to Mrs. Brown for her signature; I watched Mrs. Brown glance over the agreement and heard her say, 'I don't know what is in it, but if Jim wants it signed, I will sign it." ("Initial Keith Affidavit," Movants Ex. 10).

The Initial Keith Affidavit is completely rebutted by a second affidavit signed by Mr. Keith dated December 16, 2011 ("Second Keith Affidavit"), and by the testimony of Mr. Keith at the Hearing. Mr. Keith testified that his initial affidavit was totally incorrect, that he had only a vague recollection of the events described in the Initial Keith Affidavit, that he did not at that time review his 2008 file to refresh his recollection because he was involved in other events in his office that required his immediate attention. However, he signed the Initial Keith Affidavit in reliance on the Debtor's recollection of the events surrounding the signing of the Antenuptial Agreement. According to Mr. Keith, the Debtor appeared anxious to have the affidavit signed.

Upon later reviewing the Antenuptial Agreement and correspondence in his file, Mr. Keith prepared and executed the Second Keith Affidavit to correct the inaccuracies contained in the Initial Keith Affidavit. Directly contradicting the Debtor's testimony that she had never seen the Antenuptial Agreement before the day of her wedding and that she had never had an

opportunity to talk to an attorney about the agreement, Mr. Keith testified that he was the Debtor's attorney and he reviewed the Antenuptial Agreement with her in the weeks before the Debtor and Mr. Brown's wedding.

Mr. Keith testified that Mr. Brown requested that Mr. Keith review the Antenuptial Agreement on behalf of Debtor with an eye to protecting her. Debtor and Mr. Keith had a couple of meetings regarding the Antenuptial Agreement—one of which was about thirty minutes and a second one that occurred as a chance meeting when Mr. Keith met Debtor at a bank owned by Mr. Brown. Mr. Keith advised, or attempted to advise, Debtor that there were a few things in the Antenuptial Agreement about which he was concerned. Mr. Keith was particularly concerned that the Debtor has a disabled son, and Mr. Keith wanted to talk to her about the protection of her son in the event something happened to the Debtor. He also attempted to discuss with the Debtor the fact that she would receive nothing in the event of a divorce. Mr. Keith specifically recalled that Debtor was not concerned with her rights in the event of a divorce—at one time stating to him that "there is not going to be a divorce." According to Mr. Keith's testimony, the Debtor made it very clear to him that she did not want to talk about any changes to the Antenuptial Agreement.

Debtor's counsel also questioned Mr. Keith regarding the statements made in Mr. Greenwell's [4] affidavit (Movants Ex. 10) relating to contacts or conversations he had with Mr. Keith. Mr. Greenwell stated in his affidavit that "Mr. Keith assured me he had talked to Ms. Booth [Debtor] and explained the [Antenuptial Agreement] to

her. Mr. Keith also indicated to me that he advised Ms. Booth that there were changes he recommended she request to be made to the agreement, but that Ms. Booth said she was satisfied with the terms of the [Antenuptial Agreement]." Mr. Keith confirmed the accuracy of Mr. Greenwell's affidavit except the statement that Ms. Booth was "satisfied" with the terms of the Antenuptial Agreement. Mr. Keith indicated that it would be more accurate to state that Ms. Booth did not want any changes made to the agreement.

The Court finds Mr. Keith's statements in the Second Keith Affidavit and his testimony at the Hearing to be fully credible and well supported by the record.

Minerva and Darl Music both testified by affidavits and as rebuttal witnesses that Debtor knew about the terms of the Antenuptial Agreement before she married Mr. Brown. During the relevant time period Ms. Music was a very good friend of the Debtor and Mr. Music worked for Debtor. Ms. Music stated that she communicated with the Debtor almost daily. The Debtor offered to let Ms. Music read the agreement and called her several times to talk about the Antenuptial Agreement, one time being after a meeting regarding the agreement with Debtor's attorney, Jack Keith. According to Ms. Music, the Debtor stated that she was not concerned about the Antenuptial Agreement because she could change Mr. Brown's mind after they got married. Minerva and Darl Music were both credible witnesses.

Nyoka Peak testified as a rebuttal witness for the Movants with respect to the events surrounding Mr. Brown's execution of the Brown Deeds. Ms. Peak worked at the Nursing Home. She testified that on

---

**4.** Mr. Greenwell is the attorney who prepared the Antenuptial Agreement and was Mr. Brown's counsel.

October 30, 2009, subsequent to Mr. Brown's stroke, she went to Mr. Brown's residence with JoAnn Craddock, the Debtor's private assistant. When they arrived, the Debtor was leaving, and Mr. Brown was sitting in a chair. Mr. Brown was told by Ms. Craddock that he needed to sign some documents so that Mrs. Brown could take care of his businesses. He was not told what he was signing, and he was only shown the signature pages of the deeds he signed. Ms. Peak testified that Mr. Brown did not have a clue what he was signing and that he kept falling asleep. Ms. Craddock had to wake him several times, put the pen in his hand, and show him where to sign. Ms. Peak testified that on November 3, 2009, Ms. Craddock brought her some additional deeds that were already signed, supposedly by Mr. Brown, and Ms. Peak notarized those deeds. Ms. Peak testified that she was upset to have notarized the deeds under the circumstances, but she was afraid Mrs. Brown would fire her if she refused.

Ms. Peak previously testified in the Conservator Action. Her testimony at the Hearings in this case is consistent with the findings of the District Court in the Conservator Order. This Court finds Ms. Peak's testimony to be both honest and credible.

The testimony of the witnesses presented by the Movants, along with the testimony of the Debtor's witness, John Keith, and the affidavit of Gerald Greenwell overwhelmingly contradict the testimony of the Debtor and leave the Court to conclude that it is unlikely that the Estate would prevail if it litigated the claims against the Conservator Parties. The fact that the Debtor's claims against the Conservator Parties have little or no merit and are possibly frivolous, supports the Trustee's position that entering into the Settlement Agreement is in the best interests of the Estate.

### FACTUAL FINDINGS RELATED TO THE ESTATE'S ASSETS AND CLAIMS AGAINST THE CONSERVATOR PARTIES CONCLUSIONS OF LAW

The only remaining issue is whether the proposed Settlement Agreement meets the standard for approval under Federal Rule of Bankruptcy Rule 9019. Under Bankruptcy Rule 9019(a), to approve a proposed compromise, the Bankruptcy Court must determine whether a proposed compromise is "fair and equitable," *Protective Comm. for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968), and "in the best interests of the estate." *See Olson v. Anderson (In re Anderson)*, 377 B.R. 865, 870–71 (6th Cir. BAP 2007), *abrogated on other grounds by Schwab v. Reilly*, —— U.S. ——, 130 S.Ct. 2652, 177 L.Ed.2d 234 (2010); *see also In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 427 (7th Cir.2007); *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)*, 841 F.2d 159, 161 (7th Cir.1987). Approval of a proposed settlement is within the sound discretion of the Court. *See In re Commercial Loan Corp.*, 316 B.R. 690, 697 (Bankr. N.D.Ill.2004).

The Sixth Circuit Court of Appeals has held that "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is *fair and equitable.*" *Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir.1988) (emphasis added). The court must weigh the conflicting interests of all relevant parties, "considering such factors as the probability of success on the merits, the complexity and expense of litigation, and the rea-

sonable views of creditors." *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir.1988) (citation omitted). "A bankruptcy judge need not conduct a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The judge need only be apprised of the relevant facts and law so that he can make an informed and intelligent decision and set out the reasons for that decision." *Fishell v. Soltow (In re Fishell)*, 47 F.3d 1168, 1995 WL 66622, at *3 (6th Cir. Feb. 16, 1995) (unpublished table decision) (quoting *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir.1987)).

*Rankin v. Dault (In re Rankin)*, 396 B.R. 203, (E.D.Mich.2008) (quoting *In re Anderson*, 377 B.R. at 870–71). Courts have articulated four factors to be considered when evaluating a proposed settlement:

> Among the factors the bankruptcy judge should consider in his analysis are [i] the litigation's probability of success, [ii] the litigation's complexity, and [iii] the litigation's attendant expense, inconvenience, and delay (including the possibility that disapproving the settlement will cause wasting of assets). The bankruptcy judge should also consider [iv] the creditors' objections to the settlement; however, the creditors' views are not controlling.

*In re Am. Reserve*, 841 F.2d at 161–62 (citations omitted). *See also Monus v. Lambros*, 286 B.R. 629, 637 (N.D.Ohio 2002) (citing *In re Am. Reserve* with approval); *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007).

 The evidence in this case clearly shows that the claims the Estate has against the Conservator Parties, which the Estate is compromising, have little value while the Estate is obtaining the right to liquidate approximately $1,000,000 in assets and to distribute the proceeds to creditors. In addition, the Brown Parties' subordination agreement giving creditors, other than the Brown Parties, rights to the first $100,000 in distributions is highly beneficial to the Estate and the other allowed creditors.

As the Court has already determined above, the Trustee has correctly concluded the claims asserted against the Conservator Parties have little merit. Based on the Trustee's recommendations set forth in the Settlement Motion, the pleadings, and the testimony and arguments presented at the Hearings, the Court finds there is little probability of success on the Estate's affirmative claims against the Conservator Parties and only an extremely small chance of success of the Estate challenging ownership claims of the Brown Parties.

The expense of any litigation between the Estate and the Brown Parties would be significant and clearly outweighs any benefit the Estate could realize from such litigation. Finally, no creditors have objected to the proposed Settlement Agreement.

### *CONCLUSION*

After careful consideration of the pleadings, motions and documents, the testimony and credibility or lack thereof of all witnesses, arguments of counsel, and the record in this case and in the Adversary Proceeding, this Court finds that, subject to the exclusion of any settlement with respect to the validity of the New Will, the Settlement Motion and underlying Settlement Agreement are both fair and equitable and in the best interests of the Estate, its creditors and all other parties in interest.

IT IS HEREBY ORDERED that, with the exclusion of any settlement with respect to the New Will, the Settlement Motion and the Settlement Agreement, a copy of which is attached as Exhibit 1 to the Settlement Motion, be and they are hereby **GRANTED** and **APPROVED.** The parties to the Settlement Agreement are authorized, directed and **ORDERED** to perform all of their respective obligations under the Settlement Agreement; and

IT IS FURTHER ORDERED that the transfers of assets to the Brown Parties as set forth in the Settlement Agreement, including but not limited to the transfers of property related to the Brown Deeds, free and clear of all claims, liens, security interests, encumbrances, and interests, under the provisions of 11 U.S.C. § 363 be and hereby are **APPROVED;** and

IT IS FURTHER ORDERED that Mr. Brown's Claim shall be allowed in the amount of $2,914,449.60 as an unsecured claim under 11 U.S.C. § 502;

IT IS FURTHER ORDERED that all of the other Brown Parties' Claims will be allowed as unsecured claims under 11 U.S.C. § 502 in the amounts set forth in the Settlement Agreement; and

IT IS FINALLY ORDERED that as provided by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, this order approving the Settlement Agreement ("Order") shall not be stayed for 14 days after the entry of the Order and shall be effective immediately upon entry.